IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADRIANUS ALKEMADE and RACHELLE
ALKEMADE, individuals,

        Plaintiffs,

        v.

QUANTA INDEMNITY CO., a Colorado
Domiciled insurance company; and
GENERAL FIDELITY INSURANCE CO.,
A South Carolina domiciled insurance
company,,

        Defendants.

Case No. 6:12-cv-00844-MC

OPINION AND ORDER

_____

MCSHANE, Judge:

Plaintiffs Adrianus and Rachelle Alkemade bring this breach of contract action against their contractor's insurers. The insurers argue that based on the known-loss provision of the policies, there was no duty to defend the insured in the underlying action. Because the complaint in the underlying action alleged damages based on continuing or recurring damage from expanding soils, and because there is no question that the insured was aware of such risk long before the policies at issue, there was no duty to defend. Defendant's motion for summary judgment (ECF No. 68) is GRANTED.

1 – OPINION AND ORDER

## BACKGROUND[1]

Defendants Quanta Indemnity Co. (Quanta) and General Fidelity Insurance Co. (GFIC) both insured Meltebeke Built Paradise Homes (Meltebeke) under general liability policies. Quanta insured Meltebeke from June 30, 2005 through June 30, 2006. GFIC insured Meltebeke from June 30, 2006 through June 30, 2007; and from June 30, 2008 through June 30, 2011.

Meltebeke built the Alkemades' home in 1994. 18 months or so later, the Alkemades noticed cracks in brick walls, floor tiles and ceiling panels, and sticking of windows and sliding doors. Unfortunately, the home was built on expanding clay soils. Meltebeke spent years attempting to fix the various problems. Meltebeke repaired tiles with pavers, fixed cracks, and installed french drains to alleviate drainage problems. Nothing stopped the house from moving.

In 2002, Meltebeke hired two engineering companies to examine the property. Their reports confirmed that at least by 2002, Meltebeke knew for certain that the home was built on top of expanding soils and that the heaving soils were moving and damaging the home.

Eventually, Meltebeke hired Oregon Helical Piers, LLC (OHP) to create a new foundation of helical piers. Helical piers are screw-like foundational elements that transfer weight from soft upper soil to more compact lower soil. OHP installed the helical piers in 2002 – 2003. There is no dispute that had the piers been installed correctly, they would have provided an acceptable solution to the expanding soils problem.

Additional property damage occurred following the installation of the piers. More cracks appeared. In 2004, Meltebeke had OHP install a stabilizing cable in the attic in another unsuccessful attempt to address the movement problems. In August 2004, Meltebeke established a zero point, or normal, level for the house. By January 2005, measurements established the

---

[1] I construe all facts in the light most favorable to plaintiffs, the non-moving parties.

2 – OPINION AND ORDER

home had shifted one-half inch. Also in 2005, additional piers were installed under a porch after the porch pulled away from the house. Each of the above issues occurred prior to the policy periods in question. Needless to say, the helical piers ultimately did not fix the problems. The parties agree that the piers did not prevent expanding soils from damaging the home.

In January 2005, the Alkemades and Meltebeke executed a settlement agreement in which the Alkemades released Meltebeke from liability for the original construction of the home in return for Meltebeke warranting the helical pier work and repairs. Similar damage to the home occurred in the years following the installation of the helical piers. The dispute here is whether the post-helical pier damage was entirely new damage or a continuation or resumption of previous damage.

## I. Prior Lawsuit

In June 2010, the Alkemades filed a state court action against Meltebeke. Canal Indemnity Company and State Farm, who insured Meltebeke before June 2005, defended Meltebeke. Quanta and GFIC each denied coverage, refused to defend Meltebeke, and did not participate in any settlement agreements.

In November 2011, the Alkemades, Meltebeke, Canal, and State Farm agreed to a settlement agreement in which Meltebeke agreed to a stipulated judgment in favor of the Alkemades. Following a reasonableness hearing, the trial court entered judgment against Meltebeke for $1,600,000 in damages and $100,000 in attorneys fees. Canal and State Farm each paid $100,000 to the Alkemades in partial satisfaction of the judgment. Metlebeke, Canal, and State Farm each assigned to the Alkemades their claims against Quanta and GFIC. The Alkemades then filed this complaint alleging breach of contract claims against Quanta and GFIC based on failures to defend and indemnify Meltebeke in the underlying action.

3 – OPINION AND ORDER

Because of the number of insurers involved, GFIC's chart is helpful. As noted above, the

Alkemades argue the damage from 2003 on is new damage while GFIC's chart labels the

damage as continuing damage:

| Insurer | Policy Periods | Significant Events |
|---|---|---|
| State Farm | 1997 – 1/1/03 | 1994: Home is built<br>1995: Property damage occurs<br>1995-97: Fixes first performed<br>1998: Damage continues<br>1998: Porch and interior repairs<br>2000: Damage continues<br>2002: Engineering conducted |
| Canal Co. | 1/1/03 – 1/1/06 | 2003: OHP installs piers<br>2004: Interior cosmetic fixes<br>2004: Damage continues and cable installed in attic<br>2004: State Farm release signed<br>2005: Damage continues and porch pier installed |
| Quanta | 6/30/05 – 6/30/06 | Damage continues |
| GFIC | 6/30/06 – 6/30/07 | Damage continues |
| Berkeley Regional | 6/30/07 – 6/30/08 | Damage continues |
| GFIC | 6/30/08 – 6/30/11 | Damage continues and lawsuit filed |

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is

"genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v.*

*Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The

court reviews evidence and draws inferences in the light most favorable to the non-moving party.

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

This case turns on the interpretation of an insurance policy. Therefore, I must ascertain the intention of the parties to the policy. *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Oregon*, 313 Or. 464, 469 (1992). I first turn to the language of the policy. *Id.* (citing ORS 742.016 (except in cases not relevant here, "every contract of insurance shall be construed according to the terms and conditions of the policy.")). If the terms and conditions of the policy are ambiguous following a plain meaning review, the court considers the terms and conditions in the particular context used and then, if necessary, in the context of the policy as a whole. *Id.* at 470. If any ambiguity remains—meaning if two or more plausible interpretations of the term remain—the court resolves the ambiguity against the drafter and in favor of the insured. *Id.* Courts examine the policy language from the perspective of the ordinary purchaser of insurance. *North Pacific Ins. Co., v. American Mfrs. Mut. Ins. Co.*, 200 Or. App. 473, 478 (2005).

The relevant portions of the policy state:

b. This insurance applies to . . . "property damage" only if:

    (1) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2) The . . . "property damage" occurs during the policy period; and

    (3) Prior to the policy period, no insured . . . knew that the . . . "property damage" had occurred, in whole or in part. If such a listed insured    . . . knew, prior to the policy period, that the . . . "property damage" occurred, then any

continuation, change or resumption of such . . . "property damage" during or after
the policy period will be deemed to have been known prior to the policy period.

c. "[P]property damage" which occurs during the policy period and was not, prior
to the policy period, known to have occurred by any insured    . . . includes any
continuation, change or resumption of that . . . "property damage" after the end of
the policy period.

d. "[P]property damage" will be deemed to have been known to have occurred at
the earliest time when any insured . . .:

(1) Reports all, or any part, of the . . . "property damage" to us or any
other insurer:

(2) Receives a written or verbal demand or claim for damages because of
the . . . "property damage"; or

(3) Becomes aware by any other means that . . . "property damage" has
occurred or has begun to occur.

The policy provides the following definitions:

13. "Occurrence" means an accident, including continuous or repeated exposure
to substantially the same general harmful conditions.

* * *

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of
that property. All such loss of use shall be deemed to occur at the time of the
physical injury that caused it, or

b. Loss of use of tangible property that is not physically injured. All such
loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Stated another way, the policy covers property damage only if, prior to the policy period,

no insured knew that the physical injury to tangible property had occurred in whole or in part.

Section I(1)(b)(3) of the policy provides that if the insured knew of property damage prior to the

policy period, any continuation, change, or resumption in the property damage is deemed to have

been known prior to the policy period. Conversely, section I(1)(c) of the policy provides that if

an insured first learns of property damage during the policy period, any continuation or

6 – OPINION AND ORDER

resumption of the property damage after the policy period is deemed to occur in the policy period. The parties disagree as to whether the damage after the unsuccessful remediation attempt of the helical piers was a continuation, change, or resumption of property damage from expanding soils known to Meltebeke in the 11 years prior to the policy periods in question.

I turn first to the duty to defend. Contrary to the assertions of the Alkemades, Judge Coffin did not rule on this issue.

The duty to defend is broader than the duty to indemnify. *School Dist. v. Mission Ins. Co.*, 58 Or. App. 692, 696 (1982). If there is a possibility that the policy covers the claim, the duty to defend arises. *Id.* Courts look at the whether the complaint, without amendment, could impose liability under the policy. *Id.* at 696-97 (quoting *Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 507 (1969). If so, the insurer has a duty to defend the insured. "Any doubts regarding coverage are resolved in favor of the insured." *Id.* at 697.

The Second Amended Complaint in the underlying state case against Meltebeke alleged that approximately 18 months after construction, cracks, sticky windows, and other "symptoms of movement of the home" began to appear. ¶ 2, ECF No. 27-1, 18. The complaint states:

Meltebeke attempted to remedy the unstable foundation problem with the installation of French drains, and repaired the structural damage from time to time as it appeared. Notwithstanding Meltebeke's efforts, the symptoms recurred.

*Id.*

The complaint alleged that after OHP put in the helical piers, Meltebeke "replaced sheetrock, tile, masonry, cabinetry and finishes in order to provide plaintiffs with a home that was free of damage." ¶ 3. "After the remediation work and related repairs were completed, the foundation shoring failed, thus causing new damage to plaintiffs' home, including . . . cracking interior walls, masonry, floor tiles, roof tiles, sticky doors and windows, gapping around

7 – OPINION AND ORDER

windows so that the home is not weatherproof, broken plumbing lines, and an out-of-level garage floor slab." ¶ 16.

The complaint alleged Meltebeke breached its warranty by, among other reasons, selecting an inadequate foundation system and failing to install piers to the necessary depth. ¶ 18. The complaint is silent as to when Meltebeke or the Alkemades noticed any of the new damage following installation of the helical piers.

The second amended complaint, filed on the eve of settlement, followed the original complaint. The original complaint sought $500,000 in damages:

> as the cost of the replacement of the Chance helical piers with deeper micropile underpinning the home, the excavation of an adequate void space between the footing and the ground surface, and all costs related to structural and cosmetic repairs to the home.

¶ 8, ECF No. 27-1, 2.

As to the damage suffered, the original complaint states "After the remedial work and related repairs were completed, the symptoms recurred." *Id.* at ¶ 5. The "symptoms" were "symptoms of movement of the highly expansive soil under the home," including "cracks in the exterior brick walls, interior sheetrock, floor tiles, and ceiling panels, as well as sticky doors and windows." *Id.* at ¶ 2. In other words, the house experienced structural damage due to heaving soils. After the helical piers failed, the house experienced the same structural damage (referred to as "symptoms") from the same cause (heaving soils).

Defendants argue that the helical piers were simply one more in a long line of unsuccessful attempted remedial fixes to the known property damage resulting from expanding soils. Therefore, defendants argue the known property loss exclusion precludes coverage.

8 – OPINION AND ORDER

The Alkemades argue that Meltebeke is simply being penalized for performing his own repairs, and that this policy would certainly apply to an outside contractor brought in to fix the foundation. In that case however, section I(1)(b)(3) of the policy would not exclude coverage, as prior to the policy, the insured (outside contractor) would not have known the property damage occurred. Here, the insured is Meltebeke. And it is undisputed that prior to the policies at issue, Meltebeke knew of the property damage. After all, Meltebeke spent the prior 10 years attempting unsuccessful remedial fixes to damage caused by the expanding soils moving the foundation.

The Alkemades note that the policy does not define "continuation, change or resumption." While that is certainly true, those terms have an unambiguous plain meaning. "Resumption" includes "the act or fact of taking up again." Webster's Third New Int'l Dictionary. A "continuation" includes "the action of carrying on or resuming after an interruption or break." *Id.* In the context of the known loss provision, I conclude these terms are unambiguous as to the average purchaser of insurance.

A more difficult question is how general or specific an examination of "property damage" must be in order to come under the known loss provision. Citing *Valley Forge Ins. Co. v. American Safety Risk Retention Group, Inc.*, 2006 WL 314455 (D. Or.), the Alkemades argue that Meltebeke's knowledge of the cause of "property damage" is irrelevant, and that, in order for the known loss provision to apply, Meltebeke had to know of each specific instance of property damage prior to the policy period. For example, the Alkemades argue that because they did not experience plumbing problems prior to the policy periods, the damage to the pipes necessarily is new damage under the policy, as Meltebeke clearly did not know of broken pipes prior to the policy period.

9 – OPINION AND ORDER

*Valley Forge*, however, dealt with different policy language, and different facts, from those at issue here. *Valley Forge* dealt with construction defects in 50 condominiums, with undisputed evidence of hundreds of defects, including improper installation of framing moisture barriers, sealants, and tile veneer. Here, we are dealing with, at most, two defects: (1) the decision to build the home on expanding soils; and (2) the negligent installation of the piers. Additionally, this case deals with one sole cause (expanding soils) with similar types of damages (cracking and shifting of property). Under these circumstances, plaintiffs' argument that later damage of the same type, from the same cause, is not a continuation or resumption of earlier damage of the same type, from the same cause, is simply not a reasonable interpretation of the policy.

The Alkemades point to *Desert Mountain Properties Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421 (Ariz. 2010). *Desert Mountain* involved the construction of 50 new homes. "From the outset, some of the homes experienced settlement and drainage problems and patio cracks." *Desert Mountain* at 425. Four years later, and two months after obtaining the policy, the plaintiff learned of a particular home "that had experienced such significant settlement that the patio had sunk two to three inches, retaining walls had rotated and cracks had appeared in the roof and interior walls." *Id.* An outside consultant then concluded poor soil compaction under all 50 homes caused shifting which led to cracks and other damage requiring extensive repairs.

Unlike the facts here, the insured in *Desert Mountain* only learned of extensive damage during the policy period. Desert Mountain's vice president of development testified that prior to the outside consultant's examination during the policy period, "*There was no reason to think we had a widespread settlement issue* . . . It all was resolved, and it was a thing of the past. No one even considered it any further once there was a resolution." *Id.* (emphasis in original). Other

10 – OPINION AND ORDER

Desert Mountain employees handling the pre-policy individual complaints testified "that none of the complaints led them to believe there was a wide-scale problem with improper soil compaction" and that the initial problems "were minor issues typically seen in new home construction." *Id.* Unlike the situation in *Desert Mountain*, Meltebeke confirmed extensive settlement problems involving the only property at issue years prior to the policy period. The second amended complaint alleged Meltebeke knew, 18 months after construction, of "symptoms of movement of the home" resulting in an "unstable foundation problem." ¶ 2. *Desert Mountain* is simply inapplicable to these facts, where the insured's pre-policy knowledge of widespread problems is undisputed. In fact, plaintiffs point to no case law analogous to the somewhat unique facts at issue here.

Meltebeke's knowledge of the cause of the property damage simply cannot be separated from his knowledge of property damage. Metlebeke's knowledge prior to the policy period of expanding soils, which caused structural damage (or "symptoms") resulting in physical injury to tangible property (in the form of cracked sheetrock, masonry, tiles, and sticking windows and doors), means Meltebeke knew of a risk of property damage from expanding soils prior the policy periods.

As noted, the policy states that in order for coverage to apply, "[p]rior to the policy period, no insured . . . knew that the . . . "property damage" had occurred, in whole or in part. If such a listed insured . . . knew, prior to the policy period, that the . . . "property damage" occurred, then any continuation, change or resumption of such . . . "property damage" during or after the policy period will be deemed to have been known prior to the policy period." Section I(1)(b)(3). The same type of structural property damage, from the same danger Meltebeke knew of—and attempted unsuccessfully to address—for 10 years prior to the policy period, necessarily

11 – OPINION AND ORDER

means that according to the terms of the policy, Meltebeke knew of the property damage prior to the policy period. After all, structural problems in the home, caused by expanding soils, occurred before and after the policy periods. Whether these "symptoms" were cracked sheetrock or misaligned plumbing makes no difference. No matter what the complaints call the damage, there is no doubt that the same symptoms or damage (cracked tiles and sheetrock, sticking doors and windows, etc) to the home occurred before and after the helical pier installation. The complaints make clear these symptoms or damages are the result of heaving soils. The policy clearly states property damage "is deemed to have been known to have occurred" once the insured becomes aware that "'property damage' has occurred or has begun to occur." I(1)(d)(3).

GFIC puts it well:

> Each and every symptom of property damage that has occurred at the Alkemade residence was caused by the expansive soil, which kept heaving in spite of the initial gravel placed under the home, in spite of the French drains and in spite of the helical piers. To use Meltebeke's term, after each repair attempt, a continuation, change or resumption of damage 'recurred'.

ECF No. 68, 23. I agree.

The second amended complaint clearly alleges that Meltebeke knew of "symptoms of movement of the home" 18 months after construction. ¶ 2. The complaint alleges "Meltebeke attempted to remedy the unstable foundation problem with the installation of French drains, and repaired the structural damage from time to time as it appeared. Notwithstanding Meltebeke's efforts, the symptoms recurred." *Id.* Meltebke later "undertook to improve site drainage and to remedy the unstable foundation problem [by hiring a subcontractor to install helical piers]." *Id.* at ¶ 3. Despite his best efforts, "the foundation shoring failed, thus causing new damage to plaintiffs' home, including without limitation: cracking interior walls, masonry, floor tiles, roof tiles, sticky doors and windows, gapping around windows so that the home is not weather-proof,

12 – OPINION AND ORDER

broken plumbing lines, and an out-of-level garage floor slab." *Id.* at ¶ 6. The second amended

complaint makes clear that the "new damage" is simply a continuation or resumption of the prior

damage. As the allegations clearly indicated the loss was not covered under the relevant policies,

there was no duty to defend.

> Plaintiffs state:

> What should not be lost in all this legal and factual minutiae is the reason insurers
> include known property damage language. They do not want insureds buying
> insurance after they learn their house is on fire. Stated another way, they don't
> want contractors buying liability insurance after they discover damage they know
> may result in liability.

Resp. 21. The problem with the Alkemades' argument is that the house was already on fire, and

everyone but the future insurers knew it before Meltekebe purchased the policies at issue.

Despite knowing the house was on fire, Meltebeke went out and purchased new insurance (after

reaching a settlement with his prior insurers and the Alkemades relating to the cause of all the

property damage). In other words, despite being aware of the damage, Meltebeke did not inform

the new insurers of their potential liability to known, yet undisclosed, risks.

The known loss provision does not only protect the insurer. The policy also provides that

had Meltebeke not known of structural damages from expanding soils before the policy period,

then any continuation or resumption of structural damages from expanding soils that occurs after

the policy period is deemed to have occurred during the policy period. Policy, § I(1)(c). The

provision simply sets the risk for both parties to the contract. Any property damage from a

known risk is clearly not covered. To the average purchaser of insurance, the provision is clear

and unambiguous. Within this context, the Alkemades' argument that home movement from

expanding soils that cracked walls during the policy period is covered simply because those

13 – OPINION AND ORDER

specific cracks had not appeared prior to the policy is unreasonable. All of the post pier structural damage from movement of the home is simply a continuation or resumption of structural damage from movement of the home before the pier installation.

I conclude that recurring symptoms or damage to property, with the same underlying cause, clearly and unambiguously constitute a "continuation, change or resumption" of earlier property damage of the same type from the same cause. Because the complaints clearly allege Meltebeke knew of prior property damage resulting from heaving soils, and because the complaints clearly allege the helical piers not only failed to address the movement of the home, but also led to a continuation or recurrence of property damage due to heaving soils, I conclude defendants had no duty to defend Meltebeke in the underlying action. Attempting to define property damage as "symptoms" rather than "damage" does not suddenly give rise to a duty to defend.

## CONCLUSION

GFIC's motion for summary judgment (ECF No. 68) is GRANTED. Quanta's Motion to join (ECF No. 67) GFIC's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

DATED this 20th day of June, 2014.

/s/ Michael J. McShane
Michael McShane
United States District Judge